UNITED STATES of America, Appellee,

v.

Peter CROSBY, Defendant,

and

Kenneth Michael Robinson, Appellant.

No. 672, Docket 78–6158.

United States Court of Appeals,
Second Circuit.

Argued March 5, 1979.

Decided June 15, 1979.

Kenneth Michael Robinson, Washington, D. C., appellant pro se.

Rhea Kemble Neugarten, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., S.D.N.Y., Richard D. Weinberg, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before FRIENDLY, SMITH and MANSFIELD, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

This is an appeal from an order entered by the United States District Court for the Southern District of New York, Constance Baker Motley, Judge, directing an attorney, who was retained by a criminal defendant, to reimburse the government out of the fee paid for his services, for the amount which the government paid to a previous, court-appointed lawyer for the defendant. We

conclude that the district court exceeded its authority under the relevant provision of the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A(f), and we therefore reverse.

Peter Crosby was indicted in January, 1978 on one substantive and one conspiracy count involving securities fraud.[1] Crosby appeared before the district court on March 17, 1978 with Robert Lounsbury as counsel retained solely for the purpose of making an application for bail. On March 27, Crosby filed a financial affidavit indicating his inability to employ counsel for trial. The magistrate thereupon appointed Elliot G. Sagor to represent Crosby, under the provisions of 18 U.S.C. § 3006A(b).

During May 1978, while Sagor continued to represent Crosby in pre-trial proceedings, friends and family of Crosby contacted Kenneth Michael Robinson, an attorney in Washington, D.C., to explore the possibility that he represent Crosby at trial. Robinson, who was a former Assistant U.S. Attorney and had experience both prosecuting and defending fraud cases, was willing to undertake the defense, if an acceptable plan for payment of his retainer could be arranged.

Although some members of Crosby's family apparently are persons of some substantial means, Crosby, who was fifty-five years old at the time of his trial, seems to have nearly exhausted whatever personal financial resources he once had. He is the beneficiary of two trusts that were established by his father. These trusts, the terms of which are identical, have a combined principal value of about $104,000. Crosby, however, has no power to invade the principal. Rather, the trustee, in its sole discretion, may expend up to 5% of the principal value annually on behalf of Crosby. Moreover, trust income, which is payable to Crosby, is subject to an $8 million lien in favor of the Internal Revenue Service. The extent of Crosby's other assets and income is not alto-gether clear, but the magistrate and district judge both found that he lacked sufficient funds of his own to pay for counsel, and those rulings are not directly in issue here.

The money to retain Robinson could not be obtained from the trusts, even with the trustee's consent, because the trustee already had expended the amount that could be drawn from the principal during 1978 in paying certain medical expenses incurred by Crosby, as well as a portion of the fee owed to Lounsbury for his work on Crosby's bail application. Crosby therefore tried to obtain money from his mother. They discussed the matter with her attorney, who advised against providing the money. He believed Sagor to be competent, and he feared that Crosby might have made an arrangement with Robinson whereby Robinson would return a portion of his fee to Crosby.[2] However, after additional discussions with her son and "two or three trying days", Mrs. Crosby agreed to pay the $9,500 that Robinson demanded as an advance payment on his total fee of $20,000 plus expenses.

While these efforts to retain Robinson were being carried out, pre-trial proceedings continued. The district court first learned of the possible change of counsel on May 24, in a letter written by Sagor. Although this letter indicated that Robinson already had been retained, it became clear on the following day, when Sagor and Robinson appeared together in court, that a final agreement had not been reached. At that point, the prosecutor made reference to the provisions of 18 U.S.C. § 3006A(c), and stated:

> [I]t specifically says that if at any time after the appointment of counsel—and of course Mr. Sagor is appointed counsel—the Court having jurisdiction of the case finds that the defendant is financially able to obtain counsel or to make partial

---

1. The indictment also named Leonard James and Otto Sebold as defendants in conspiracy and mail and securities fraud counts.

2. Although such suspicion of Crosby was not unwarranted in light of the family's experience with his financial dealings, there is nothing in the record to suggest that Robinson actually was involved in any such connivance with Crosby.

payment for the representation, he [the Court] . . . may terminate the appointment of counsel or authorize payment as provided in subsection (f) as the interests of justice may dictate; and subsection (f) provides whenever the Court finds that funds are available for payment from or on behalf of a defendant the Court may authorize or direct that such funds be paid to the appointed attorney or to various other persons.

It seems to me that as of a week ago when Mr. Robinson says he was contacted by the family, at least a week if not longer ago, such funds were available at least on behalf of Mr. Crosby.

The prosecutor continued:

And in fact the Government asks that—we don't necessarily have to do it today, but I think at some point—an inquiry should be made as to whether Mr. Sagor [sic] services to this date could have been paid by the defendant or on behalf of the defendant and therefore rather than have Federal moneys expended for Mr. Sagor that he be paid by those sources of funds for the defendant.

The court did not respond directly to these statements, but Sagor stated that he understood that he would be relieved of his appointment if Robinson took the case. The court recessed until May 31.

Arrangements to retain Robinson still were not complete on May 31, so the trial began with Sagor representing Crosby. By June 6, Mrs. Crosby made her final decision to provide the money to pay Robinson. He returned to New York and received a check for $9,500 drawn on one of her bank accounts.

Robinson then proceeded immediately to the courtroom, where Sagor announced that Robinson was ready to take over the defense. The government expressed its concern that the record establish Crosby's awareness of the disadvantages of switching counsel and his "clear and conscious choice" that he do so, lest there later be a claim of ineffective assistance of counsel because of Robinson's late entry into the case. The government also again raised the issue of the prior expenditure of government funds for Crosby's appointed counsel:

[W]e are in no way waiving whatever kind of future proceeding we might wish on the subject of the propriety of Mr. Crosby having had CJA counsel today.

\* \* \* \* \* \*

As a related matter, the government is not in any way waiving its right to investigate and seek an indictment if it thinks it appropriate having to do with the original appointment of CJA counsel which might be in the areas of perjury on the affidavit in support of the application for CJA. . . .

The trial judge then conducted an extensive discussion involving Crosby, Sagor and Robinson. Although the colloquy dealt primarily with whether Robinson should be permitted to replace Sagor, the judge also commented on the possible reimbursement of CJA expenditures:

[A] substantial cost has already been incurred, Mr. Crosby, which I would still have to go into at the end of the trial, to determine whether you could have paid for those expenses.

\* \* \* \* \* \*

I would have a duty to do that under the law, to make sure that you were not able through your own means or your family's means to pay these expenses.

Several minutes later she again discussed the possibility of reimbursement:

THE COURT: [Addressing the U.S. Attorney] . . . I just pointed out to [Crosby] that if it appears after the trial that he has money, he has to pay for all of the expenses incurred thus far, which are in the thousands of dollars. . . . [Addressing Crosby] So you wouldn't be relieved from having to pay that [the expenses] if it appeared later that you were financially able.

MR. CROSBY: And if it appeared later that I was financially unable?

THE COURT: *Then the government would have to pay it.* But we have to assume that if you could find a lawyer at this point, that it might be that you could

have found a lawyer earlier, to save the government that expense. (Emphasis added)

\* \* \* \* \* \*

I want you to know we are not dropping that part of it. That is whether you have to pay all of the expenses thus far if at the end of the trial it appears that you had sufficient funds with which to retain counsel.

At the conclusion of this discussion, the judge allowed the substitution of counsel. The trial continued, and Crosby was the only one of the three defendants to be acquitted.

The district court conducted a hearing on September 6, 1978. After a recitation of stipulations regarding Crosby's financial affairs, Robinson, again representing Crosby, inquired of the court what the precise purpose of the hearing was to be. The judge responded that it was "an inquiry into whether he [Crosby] should not be required to pay Mr. Sagor's fee under the Criminal Justice Act." Crosby's mother, her lawyer, the bank officer in charge of her accounts and Crosby's trust accounts, Lounsbury, and Crosby's probation officer testified. Their testimony and the exhibits received concerned Crosby's personal finances, the arrangement for payment of Robinson's fee, the unwillingness of Crosby's mother to pay the outstanding balance of Robinson's fee or the amount paid by the government to Sagor, and previous expenditures by Crosby's family on his behalf. The government argued that the approximately $1,500 paid to Lounsbury out of the trust principal and the $9,500 paid to Robinson by Mrs. Crosby represented funds which had been "available for payment" within the meaning of § 3006A. It also contended that Crosby himself had available funds. Robinson responded, on behalf of Crosby, that Crosby's resources were insufficient to require reimbursement of the government and that Mrs.

Crosby's assets were not available within the meaning of the statute, since Crosby had no obligation to ask his mother for financial assistance.

After both sides had concluded their arguments, the district judge addressed Robinson:

As I have indicated, it is undisputed that Mr. Crosby's mother made available for his defense in this case $9,500. It is also clear that you came into the case, Mr. Robinson, knowing full well that the defendant had been furnished counsel by the Court and that *Mr. Crosby* would have to pay that counsel if the Court found that any funds were available.

There is a statute relating to this problem.

As a matter of fact, it is undisputed that Mr. Crosby contemplated paying Mr. Sagor and retaining him as well as yourself in this case, but instead gave all the money to you.

So the Court is going to direct that *you* pay the United States the money that Mr. Sagor is going to get, which is $4,740.65. (Emphasis added.)

The court subsequently formalized its findings and decision in a written, unreported opinion. *United States v. Crosby,* 78 Cr. 75 (S.D.N.Y., September 29, 1978).

▮ Robinson vigorously attacks the district court's order. He argues, first, that the $9,500 was not available for payment from or on behalf of Crosby, and second, that he was given no prior notice that he was to be a target of the recoupment effort at the post-trial hearing. We find both of these contentions to be meritorious and will discuss them in reverse order.

Few cases have considered the reimbursement provision of 18 U.S.C. § 3006A(f),[3] and this court knows of no other occasion on which the statute has been applied in a

---

**3.** 18 U.S.C. § 3006A(f) provides, in relevant part:

Whenever the United States magistrate or the court finds that funds are available for payment from or on behalf of a person furnished representation, it may authorize or direct that such funds be paid . . . to the court for deposit in the Treasury as a reimbursement to the appropriation, current at the time of payment, to carry out the provisions of this section.

situation involving counsel retained after a lawyer had been appointed. However, we can draw some guidance from the one other case in which this court has analyzed § 3006A(f). In *United States v. Bracewell,* 569 F.2d 1194 (2d Cir. 1978), we reversed and remanded for further proceedings an order that allowed the United States to deposit, for reimbursement of appointed counsel, money seized from the defendant at the time of his arrest. The order was entered upon a motion by the government and after the defendant had submitted papers in opposition. The district court, however, made no findings on the record as to the defendant's financial status. Although this court stated that the district judge ordinarily need not conduct a full-scale adversarial inquiry in response to such a motion, we held that any defenses to repayment should be fully considered and that the record must reflect the court's findings after such consideration.

In the present case the court did consider the defendant Crosby's defenses to repayment and even allowed him a full hearing with an opportunity to present and cross-examine witnesses. But the court not only failed to give Robinson an opportunity to present his defenses to repayment, but also denied him notice that he was a target of the inquiry. *See United States v. Bursey,* 515 F.2d 1228, 1238 (5th Cir. 1975). We can find no support in the record for the government's assertions that Robinson had knowledge that he might be held personally liable. Our review of the remarks made by both the prosecutor and the district judge, *supra,* at 25–27, demonstrates that the subject of the September 6 hearing was to be, and in fact was, whether Crosby should be required to pay Sagor's fee.

The government argues that Robinson had notice because he

participated as Crosby's attorney in the post-trial hearing in which the Government sought reimbursement . . ., cross-examined numerous witnesses, was permitted to give a lengthy factual recitation concerning his knowledge of the relevant events, was allowed to call witnesses, and to make an oral presentation to the District Court. (Government brief on appeal, at 27.)

There is no doubt that Robinson did all these things, but, as the quoted excerpt from the government's brief itself indicates, he did them as Crosby's attorney, not on behalf of himself. Had Robinson been considered a target of the recoupment effort, he surely should have been disqualified from representing Crosby, for their interests would have been in clear conflict. Yet neither the government nor the court ever suggested that such was the case. Thus we conclude that Robinson was without notice of any potential liability.[4]

The foregoing conclusion ordinarily would require that we reverse the district court's order and remand for proper consideration of any defenses raised by Robinson. *Bracewell, supra,* 569 F.2d at 1200. No remand is necessary, however, because we agree with Robinson that the money already paid to him was not "available" within the meaning of § 3006A(f).

Although this court said in *Bracewell, supra,* 569 F.2d at 1198, that § 3006A(f) "does not, by its terms, explain how it is to be applied," the statute cannot reasonably be read to include funds that have been paid unconditionally to a third party. The provision refers to funds which "*are* available for payment" (emphasis added) on behalf of the defendant. Whatever the status of the $9,500 may once have

4. Although Robinson's subjective belief of course is not conclusive on the question whether he had notice, his surprise is evident in the following exchange, which occurred immediately after the judge announced her decision:

Mr. Robinson: Your Honor is instructing who to pay what?
The Court: Mr. Robinson to pay it.

Mr. Robinson: You are instructing me to pay Mr. Sagor?
The Court: Yes.
* * * * * *
Mr. Robinson: This hearing was held to see Mr. Crosby should pay this bill. I have not had proper notice.

been,[5] it is undisputed that it is no longer in the hands of Crosby or his mother, but instead has been paid to (and perhaps spent by) Robinson. The record shows that at no time did anyone suggest that any conditions were being imposed on his acceptance of the payment. Each of the references during the May 25 and June 6 discussions to the possibility of future reimbursement of the government, *supra,* at 25–27, suggested that Crosby might later be found to have funds available for repayment. There was no indication that Robinson might be required to share his retainer with Sagor. Moreover, it is quite clear that Crosby's mother was never willing to make money directly available to Crosby, but only to bring Robinson into the case. Therefore, the $9,500 advance accepted unconditionally by Robinson was not available from or on behalf of Crosby when the district court issued its order.[6]

We share the district judge's concern for preserving the integrity and preventing abuses of the CJA program. Such concern, however, cannot justify a result that would be at odds with the language of the statute and would unfairly do harm to Robinson. The district court believed that its order left Robinson in "much the same position" as when he entered the case, since the "only difference" was that he received some $4,700 less of his total retainer as an advance. *Crosby, supra,* at 14. This conclusion apparently was based on the judge's belief, expressed during her post-decision discussion with Robinson, that "Mr. Crosby will owe you that money, and just like you got the $9,500 out of him, you can get the rest out of him, because he has assets." This statement, however, was inconsistent

with her finding that Crosby did not have assets available to reimburse the government. If such assets were available, Crosby, not Robinson, should have been ordered to repay the government.

Moreover, the amount of the advance payment was obviously of importance to Robinson's decision to take the case. He refused to do so, although the trial began in the interim, until he was· assured of and actually ´paid $9,500. Robinson's concern is not difficult to understand, in light of Crosby's tenuous financial circumstances. Robinson agreed to represent Crosby at the urging of two of his regular clients, but he demanded the advance payment in order to protect himself against a possible total loss. As to the remainder of the fee (for which Crosby, not his family, was responsible). Robinson "rolled the dice that [he] would get paid" and, as of the time of the hearing, "came up 'snake eyes.' "[7] If Robinson had been informed before he entered the case that Sagor's fee might be deducted from his advance, it seems likely that he either would have refused to take the case or would have demanded a corresponding increase in the amount of the advance. Whether Mrs. Crosby or anyone else would have provided the additional amount of course is unknown.

Lastly, the district judge stated and the government argues that the order was not inequitable because Robinson's representation of Crosby was assisted immeasurably by the work done by Sagor. That Sagor's preparation for trial was essential to Crosby's defense is undeniable. However, Robinson entered the case with the knowledge that this work already had been done, and

---

**5.** We express no opinion on the question whether the district court's order might have been appropriate if, for example, the court had informed Mr. Robinson, when he sought to enter the case, that the $9,500 might become subject to the government's demand and then ordered the money placed in an escrow pending determination of this issue after the trial was completed. The record makes it evident that Mr. Robinson would not have accepted a retainer so conditioned.

**6.** We do not suggest that a district court could not consider the availability of such funds in determining whether additional funds were available from or on behalf of a defendant. Here, however, the court specifically found that Crosby "had or has no funds availabe [sic] for counsel." *United States v. Crosby,* 78 Cr. 75, unreported opinion at 10 (S.D.N.Y., September 29, 1978).

**7.** Robinson explained this expression to the district court: "You get two ones on the dice and that's when you lose what's in the pot."

we must assume, in the absence of any proof to the contrary, that Robinson set his retainer, including the amount of the advance payment, on that basis.

Because the $9,500 received by Robinson was not available for payment within the meaning of § 3006A(f), the order of the district court is reversed.