# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 98-4127

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Kenneth G. Brockman, | * |
| | * |
| Appellant. | * |

_____

No. 98-4128

_____

Appeals from the United States
District Court for the
District of Nebraska.

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Carolyn A. Kruger, | * |
| | * |
| Appellant. | * |

_____

Submitted: June 15, 1999
Filed: July 16, 1999

_____

Before RICHARD S. ARNOLD and LOKEN, Circuit Judges, and BYRNE,[1] District
    Judge.

_____

BYRNE, District Judge.

Kenneth G. Brockman and Carolyn A. Kruger appeal their convictions for multiple counts of mail fraud and wire fraud, and conspiracy to commit mail fraud and wire fraud, in violation of 18 U.S.C. §§ 371, 1341, 1343. Kruger also appeals her sentence. We affirm.

## I.    BACKGROUND

Kruger was the President of Biologically Guided Life Systems, Inc. ("BGLS"), and Brockman has been variously described as the founder of BGLS and, at times, as a consultant to the company. BGLS was represented to be a research, development, and marketing company working in the field of alternative health care. Between 1984 and 1997, Brockman, Kruger, and others working at their direction represented that they were in the process of developing numerous business projects that would result in broader availability of alternative health resources and would be quite lucrative for those who assisted in bringing the projects to fruition. Among the proposals were projects involving the development of motivational tapes, infomercials, health resorts, diagnostic centers, treatment clinics, and health depots.

Over a thirteen-year period, appellants solicited more than $5,000,000 from

_____

[1]The Honorable Wm. Matthew Byrne, Jr., Senior United States District Judge for the Central District of California, sitting by designation.

lenders and investors while representing that their business projects were close to completion. Appellants told lenders that funds were needed for a very short period of time, until "major funding" was obtained from large-scale individual and institutional investors. Appellants further represented that funds lent to BGLS or its principals would be repaid in a matter of weeks or months at interest rates ranging from 16% to 300% per annum. In fact, not one of the projects described to potential lenders and investors was ever developed to the point that it made money, no major funding was ever obtained, and less than $500,000 was ever repaid.[2]

Appellants also made other misrepresentations to raise money. Some lenders and investors were told, for instance, that they would be provided stock in certain companies in exchange for providing monies to BGLS and its principals. Other lenders and investors were given specific assurances that they would be repaid within thirty days upon request. Brockman told some lenders that he had multimillion dollar job offers which he could always accept as a means of paying off lenders if his projects failed. Kruger told at least one lender that she would take a job to pay back a loan if the projects did not succeed. Finally, certain lenders were told that they would be allotted area manager positions or sales territories which would allow them to participate in the marketing of BGLS' products and services. Appellants never delivered on any of these promises.

In the spring of 1996, search warrants were executed on the business premises and home of appellants. Seized during the searches were several statements prepared by Brockman and signed by Kruger in which Kruger confessed to various acts of fraud. In one, entitled "Confession of Guilt, Admission to Criminal Activity," Kruger admitted defrauding investors by failing to disclose to them the true risks associated with their loans and stated that when she convinced people to become lenders, she did so

---

[2]Since no projects were taken to the money-making stage, repayments to early lenders were made out of funds obtained from later lenders.

"without any intention of seeing them repaid."

Appellants were indicted on April 23, 1997. Kruger moved to dismiss her indictment for unreasonable pre-indictment delay. The motion was denied, and Kruger was convicted following a jury trial of conspiracy to commit mail fraud and wire fraud, five counts of mail fraud, and one count of wire fraud. The court deemed Brockman, who was initially represented by a federal public defender, to have the financial ability to retain counsel and thus directed the public defender to withdraw from the case. Brockman proceeded to trial pro se and was convicted along with Kruger on the same counts.

The court enhanced Kruger's sentencing range under U.S.S.G. § 3B1.1 based upon her leadership role in the conspiracy and sentenced her to 39 months imprisonment. Brockman, who also received an enhancement for his role in the offense, was sentenced to 78 months imprisonment.

## II.    DISCUSSION

On appeal, Kruger contends that the district court erred by failing to dismiss her indictment for unreasonable pre-indictment delay and by enhancing her sentencing range under U.S.S.G. § 3B1.1. Brockman contends that the district court erred when it discharged the public defender prior to trial, failed to advise him of his Fifth Amendment right not to testify, and permitted jurors to question witnesses.

A.    Pre-indictment delay

Kruger filed a motion to dismiss the April 23, 1997 indictment for unreasonable pre-indictment delay under the Fifth Amendment. Kruger argued that the government should have brought an indictment no later than 1992  and suggested that the

government's five-year delay prejudiced her through the loss of crucial witness testimony and other evidence. Kruger specifically identified four witnesses as unavailable. The first, a lender who had been substantially repaid, had passed away. The second, an investor and staunch supporter of BGLS, had been incapacitated by a stroke. The third and fourth witnesses, a lender and a strong supporter of appellants' businesses, respectively, had also passed away.

While "[s]tatutes of limitation provide the primary guarantee against prosecution of a defendant on overly stale charges," the due process clause does have "a 'limited role to play in protecting against oppressive delay.'" United States v. Bartlett, 794 F.2d 1285, 1289 (8th Cir. 1986) (quoting United States v. Lovasco, 431 U.S. 783, 789 (1977)). Pre-indictment delay is sufficiently "oppressive" to warrant dismissal of an indictment where the delay is unreasonable and the defendant is actually and substantially prejudiced in the presentation of her case. See id. The actual and substantial prejudice issue is ordinarily considered first. See United States v. Benshop, 138 F.3d 1229, 1234 (8th Cir. 1998).

A defendant bears the burden of proving actual and substantial prejudice attributable to pre-indictment delay. See Lovasco, 431 U.S. at 789-90; Bartlett, 794 F.2d at 1289. "To prove actual prejudice, a defendant must specifically identify witnesses or documents lost during delay properly attributable to the government." Bartlett, 794 F.2d at 1289. It is not sufficient for a defendant to make speculative or conclusory claims of possible prejudice as a result of the passage of time. See id. at 1289-90; see also United States v. Marion, 404 U.S. 307, 325-26 (1971). Nor may a defendant establish actual prejudice without "relat[ing] the substance of the testimony which would be offered by the missing witnesses or the information contained in lost documents in sufficient detail to permit a court to assess accurately whether the information is material to the accused's defense." Bartlett, 794 F.2d at 1290. Finally, it is defendant's burden to show that the lost testimony or information is not available through another source. See id.

The district court found no actual and substantial prejudice from the pre-indictment delay. The court emphasized that the lenders who were unavailable to testify represented only four of approximately 260 lenders to BGLS and its principals. As recently as 1994, defendants had received more than sixty lender statements in which individuals who had provided funds to BGLS stated that they were not fraudulently induced to loan money and that they knew that their funds were to be used for "personal and business expenses." Finally, the district court noted that appellants had retained impeccable documentary evidence of their business transactions that could establish the fact of repayment to lenders who were no longer available to testify.

The district court's finding was not clearly erroneous. See id. at 1291 n.7 (district court's findings with respect to prejudice from pre-indictment delay reviewed for clear error). Even assuming that Kruger offered sufficiently detailed allegations of what the four unavailable witnesses would have said had they testified, Kruger did not sustain her burden of establishing actual and substantial prejudice from the delay. Specifically, Kruger failed to show that any of the lost testimony was not available through other sources. The fact that one or more of the unavailable lenders had been repaid could be established through documentary evidence, and several hundred other lenders, including approximately sixty lenders who had expressed satisfaction with appellants' handling of their loans, remained available to testify.[3]

On appeal, Kruger also suggests a second type of prejudice that stemmed from

_____

[3]While Kruger contends that she should have been excused from the usual burden of proving actual and substantial prejudice in light of the scope of conspiracy alleged and the failure to issue a bill of particulars, she offers no support for this proposition. In any event, Kruger had all of the information she needed to identify actual and substantial prejudice without a bill of particulars. Appellants' own records identified each of the lenders with whom they had dealt over the life of the alleged conspiracy, and the district court required the government to disclose the identities of those persons with whom appellants were alleged to have conspired.

the pre-indictment delay, that being the higher sentence she faced as a result of increasing amounts of loss throughout the period of delay. This allegation of prejudice is more creative, but ultimately no more meritorious, than the first. It is questionable whether an increased sentence is the type of prejudice against which the Fifth Amendment is intended to protect, i.e., prejudice to a defendant "in the presentation of his case." Id. at 1289. Moreover, while we have not addressed claims of sentencing prejudice in the Fifth Amendment context, we have rejected analogous claims of "sentencing entrapment" in challenges to actual sentences imposed. See, e.g., United States v. Lenfesty, 923 F.2d 1293, 1300 (8th Cir. 1991).

Several other circuits have more directly considered and rejected claims of sentencing prejudice in the Fifth Amendment context. In United States v. Spears, 159 F.3d 1081 (7th Cir. 1998), the Seventh Circuit considered a defendant's argument that he had been prejudiced by pre-indictment delay because, during the time between the offense and the indictment, he had accumulated seventeen additional criminal history points. The court analogized the defendant's claim to one of sentencing manipulation and rejected the claim, noting that "[a]ny sort of prejudice [defendant] may have suffered was the result of his own criminal conduct, and not from any government misconduct." Id. at 1086.[4] In United States v. Martinez, 77 F.3d 332 (9th Cir. 1996), the Ninth Circuit reached the same result on different grounds, holding that any sentencing prejudice caused by pre-indictment delay is too speculative to implicate a due process right. Id. at 336-37. The court emphasized that "[t]he sentencing guidelines are not the procrustean bed sometimes supposed" and that a district court may make a downward departure to account for the harshness of a sentence attributable

_____

[4]While the additional criminal history points in Spears stemmed from conduct unrelated to the offense of conviction, the due process implications are the same where a defendant's later conduct forms part of the charged offense. See United States v. Music, 1998 WL 609719, at *2 (4th Cir. Sept. 1, 1998) (unpublished opinion) ("The Government's conduct in this case, simply letting fraudulent transactions continue, does not amount to outrageous conduct resulting in a due process violation.").

to pre-indictment delay.  Id.

Because we have previously rejected sentencing claims analogous to Kruger's, and other circuits have uniformly rejected these same claims in the Fifth Amendment context, the district court did not err in denying Kruger's motion to dismiss her indictment for unreasonable pre-indictment delay.

B.     Discharge of court-appointed counsel

During the years leading up to his indictment, Brockman had employed the services of attorney Michael Pistillo.  Following the issuance of a civil injunction in May 1996, Pistillo advised Brockman to request a public defender.  An attorney from the Federal Public Defender's Office was appointed and thereafter represented Brockman in pre-indictment criminal matters.  Following Brockman's indictment, and upon review of the Pretrial Services Report, the government filed a Motion to Determine Eligibility for Appointed Counsel.  The magistrate judge found that defendant was financially able to obtain counsel and directed the public defender to withdraw from the case.  The district court rejected Brockman's appeal of the magistrate judge's ruling.  Brockman proceeded to trial pro se.[5]  Brockman contends that the district court erred when it discharged the public defender in violation of his Fifth and Sixth Amendment rights.

The Criminal Justice Act ("CJA") was passed by Congress in 1964 "to insure that defendants who are financially unable to afford trial services necessary to an adequate defense are provided them in accordance with the Sixth Amendment to the United States Constitution."  United States v. Barcelon, 833 F.2d 894, 896 (10th Cir. 1987).  Counsel must be appointed under the CJA if the court is satisfied after

---

[5]     Brockman did retain counsel to represent him at the sentencing stage, and Brockman is also represented on appeal.

"appropriate inquiry" that the defendant is "financially unable to obtain counsel." 18 U.S.C. § 3006A(b); see Barcelon, 833 F.2d at 897. When requesting the appointment of counsel, the burden is on the defendant to show that he is "financially unable" to afford representation. See United States v. Lefkowitz, 125 F.3d 608, 621 (8th Cir. 1997). Financial inability to pay "is not the same as indigence or destitution," Museitef v. United States, 131 F.3d 714, 716 (8th Cir. 1997), and doubts as to eligibility should be resolved in a defendant's favor. See United States v. Harris, 707 F.2d 653, 660 (2d Cir. 1983). The district court's assessment of a defendant's ability to afford representation is reviewed for clear error. See United States v. O'Neil, 118 F.3d 65, 74 (2d Cir. 1997); United States v. Kane, 955 F.2d 110, 112 (1st Cir. 1992).

The district court's factual determination that Brockman was financially able to afford representation was not clearly erroneous. The evidence presented showed that Brockman received "living expenses" of about $10,000 a month pursuant to a joint venture agreement he had with a company named 3KM. Among Brockman's monthly "living expenses" were lease payments on four automobiles totaling nearly $2,300 per month, "dependent" support expenses of $1,500 per month, and groceries and nutritional expenses of $1,340 per month. The itemized expenses Brockman submitted in connection with his appeal of the magistrate judge's ruling on the motion further revealed monthly payments of $200 a month for cellular phone service on five phones and at least periodic payments on credit cards belonging to persons other than Brockman's "dependents."

Given the broad range of "living expenses" for which Brockman received funds under the joint venture agreement, it was not clearly erroneous for the court to find that Brockman could obtain reimbursement for legal fees. Nothing in the joint venture agreement precluded reimbursement for legal fees, and Brockman never called the principals of 3KM to testify nor provided any written correspondence from them in

connection with the government's motion or his appeal of the magistrate judge's ruling.[6] Moreover, Brockman's itemized expenses for April 1997 included a $250 payment to attorney Pistillo for "legal services." While Brockman contends that the court should have gone further in attempting to ascertain whether reimbursable "living expenses" under the joint venture agreement included criminal defense fees, it is Brockman who bore the burden of establishing his inability to afford representation. Despite numerous filings and appearances before the magistrate judge and district court, Brockman failed to satisfy this burden.[7]

C.    <u>Fifth Amendment right not to testify</u>

Brockman next contends that his Fifth Amendment rights were violated by the district court's failure to advise him of his right not to testify. Brockman recognizes that the district court does not ordinarily have a duty to sua sponte advise a defendant of his right not to testify. Brockman suggests, however, that the court acquires such a duty where the defendant is proceeding pro se.

---

[6]It was not until several months after the public defender had withdrawn from the case that Brockman first submitted correspondence from 3KM purporting to preclude reimbursement for criminal defense fees. Brockman submitted the correspondence in connection with a request for CJA funds to retain investigators and cover such expenses as computer-assisted legal research and filing fees. However, Brockman never moved for reconsideration of the district court's ruling on his eligibility for appointed counsel after the correspondence had finally been provided to the court.

[7]While Brockman also asserts an ineffective assistance of counsel argument, contending that his own pro se representation was not objectively reasonable and prejudiced his defense, it is well established that a defendant who exercises his right to appear pro se cannot thereafter complain that the quality of his own defense amounted to a denial of effective assistance of counsel. See McKaskle v. Wiggins, 465 U.S. 168, 177 n.8 (1984); see also United States v. Baker, 84 F.3d 1263, 1267 (10th Cir. 1996).

We need not decide this issue as the district court did advise Brockman, before he took the stand, of his right not to testify. If there was any doubt that Brockman understood this right, one need look no further than Brockman's own closing argument to the jury:

> Obviously in cases that at least are publicized the defendants seldom ever testify. And there is a reason for that, because, number one, they don't have to. And if they don't have to, then if they feel uncomfortable about what might happen if they do testify, they usually choose not to. That option was made to me and I chose to testify, and the reason I chose to testify is I know in my heart I have nothing to hide.

(Tr. at 2308-09). Thus, even if the court had a duty to advise Brockman of his right not to testify, Brockman's Fifth Amendment claim would fail.

D.     Questioning by jurors

Brockman's final contention is that the district court erred in permitting jurors to ask questions of the witnesses during the course of the trial, thus placing jurors in the role of advocates rather than impartial factfinders. We have previously held that "the practice of allowing juror questions is a matter committed to the sound discretion of the district court and is not prejudicial per se." United States v. George 986 F.2d 1176, 1178 (8th Cir. 1993). Because Brockman failed to object to juror questioning at trial, review is for plain error. See United States v. Tulk, 171 F.3d 596, 599 (8th Cir. 1999).

In United States v. Groene, 998 F.2d 604, 606 (8th Cir. 1993), we held that allowing jurors to ask questions of witnesses is not plain error. "Various panels of this circuit, nonetheless, have expressed considerable uneasiness about the practice, especially where . . . the individual jurors posit questions within the hearing of the whole jury." Id.

The reasons given for being skeptical of the procedure . . . are that juror

questioning may tend to transform jurors from neutral fact finders into advocates, that the process of formulating questions may precipitate prematurely the deliberation phase of trial, that jurors may weigh more heavily the answers to questions from each other than the answers to questions from counsel, that jurors may ask questions about legally irrelevant and legally inadmissible evidence, and that an objecting party risks alienating the jury.

Id.; see also United States v. Bascope-Zurita, 68 F.3d 1057, 1064 (8th Cir. 1995).

Notwithstanding the risks inherent in juror questioning, the procedure the district court employed in this case conformed to our prior directives. See George, 986 F.2d at 1179 (finding no prejudice where jurors directed questions to the bench and, if the court deemed the question proper, the witness was instructed to answer it); see also United States v. Land, 877 F.2d 17, 19 (8th Cir. 1989) (finding no prejudice even though juror questions were stated out loud before the court had ruled them proper). Indeed, the procedure employed in this case mirrored that suggested in Groene: "[I]f juror questions are allowed, the trial court should carefully weigh using a procedure that requires those questions to be submitted in writing or out of the hearing of (and without discussion with) other jurors." Groene, 998 F.2d at 606.

Because Brockman has identified no more than speculative prejudice from the district court's procedure or from juror questioning generally, the district court did not commit plain error.

E.    Sentencing enhancement for role in offense

Kruger's final contention is that the district court improperly enhanced her sentence under U.S.S.G. § 3B1.1 when it increased her offense level by four because of her role in the offense. Section 3B1.1(a) provides for an four-level enhancement "[i]f the defendant was an organizer or leader of a criminal activity that involved five

or more participants or was otherwise extensive." To qualify for an adjustment, the defendant must have been the organizer or leader of one or more "participants," § 3B1.1, comment. n.2, with a "participant" defined as "a person who is criminally responsible for the commission of the offense." § 3B1.1, comment. n.1. Persons who are not indicted or tried, but who are nonetheless criminally responsible for defendant's crime, are "participants" under § 3B1.1. See § 3B1.1, comment. n.1; United States v. Freeman, 30 F.3d 1040, 1042 (8th Cir. 1994).

Section 3B1.1 employs a "broad definition" of what constitutes an organizer or leader, and "[a] defendant need not directly control others in the organization to have functioned as an organizer." United States v. Morris, 18 F.3d 562, 569 (8th Cir. 1994). Among factors considered in evaluating a defendant's role in the offense are

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning and organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

§ 3B1.1 comment. n.4; see also United States v. Maejia, 928 F.2d 810, 816 (8th Cir. 1991).

A § 3B1.1(a) enhancement may be imposed on the organizer or leader of a criminal activity that involved fewer than five participants if the criminal activity "was otherwise extensive." The "otherwise extensive" language "refers to the number of persons involved in the operation, and includes all persons involved during the course of the entire offense, including outsiders who did not have knowledge of the facts." United States v. West, 942 F.2d 528, 531 (8th Cir. 1991) (internal quotations and citations omitted). While extensiveness is generally determined based upon the number of persons involved in the commission of an offense, courts also consider the amount of loss caused by the offense. See, e.g., Morphew v. United States, 909 F.2d 1143,

1145 (8th Cir. 1990) ("Whether or not there were five or more persons involved, it is plain that an enterprise generating a 'take' of over a quarter million dollars can properly be regarded as 'extensive.'").

The district court's finding that Kruger was a leader or organizer is amply supported by the record, and Kruger does not attack this finding. Kruger instead contends that the district court erred in finding that there were at least five participants in the offense or, alternatively, that the criminal activity was otherwise extensive. The district court, however, specifically identified four people who appeared to be participants for purposes of § 3B1.1(a) and noted that other "con men" were brought in to give legitimacy to the business. The court also found that the $5.8 million, thirteen-year scheme was otherwise extensive for purposes of enhancement, pointing out that a number of other people had been used, "wittingly or unwittingly, to make this work." Neither of these findings was clearly erroneous. See United States v. Dijan, 37 F.3d 398, 403 (8th Cir. 1994) (district court's determination of defendant's role in an offense reviewed for clear error).[8]

## III.    CONCLUSION

For the foregoing reasons, we AFFIRM appellants' convictions and Kruger's sentence.

A true copy.

---

[8]In her reply brief, Kruger also contends that the district court engaged in impermissible double counting by enhancing her sentence under U.S.S.G. §§ 2F1.1 and 3B1.1. This contention, and each of the other contentions raised for the first time in the reply brief, lack merit. See United States v. Willis, 997 F.2d 407, 418-19 (8th Cir. 1993) (rejecting an identical double-counting argument).

-14-

Attest:


      CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.