# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2514
No. 07-2888

_____

United States of America,                   \*

                                      \*

          Appellee,             \*

                                      \*     Appeals from the United States

    v.                           \*     District Court for the

                                      \*     Western District of Arkansas.

Hollis Wayne Fincher,             \*

                                      \*

          Appellant.             \*

_____

Submitted: March 10, 2008
Filed: August 13, 2008

_____

Before WOLLMAN, BOWMAN, and MELLOY, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Hollis Wayne Fincher was convicted by a jury on one count of possession of a machine gun, in violation of 18 U.S.C. §§ 922(o), 924(a)(2), and one count of possession of an unregistered sawed-off shotgun, in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871. Fincher does not dispute that he possessed these guns or that he did so without a license. He appeals his conviction, however, arguing that he has the right to possess these weapons under the Second Amendment of the United States Constitution because his possession has some reasonable relationship to the maintenance of a well regulated militia. Fincher also challenges the district court's determination that he is not eligible for court appointed counsel and challenges the

district court's request to resentence him. We affirm the conviction and remand the issue of Fincher's eligibility for court appointed counsel to the district court for further inquiry.

## I. Second Amendment

### A. Background

Before Fincher's trial began, the government became aware of Fincher's intention to argue to the jury that his possession of guns was protected under the Second Amendment. Because that issue is a matter of law, the government filed a motion in limine asking the district court to prevent Fincher from arguing matters of law to the jury. After hearing oral argument on the motion, the district court granted the motion in part and denied it in part. In doing so, the district court stated that matters of law are "quintessentially within the province of the judge and not matters to be addressed to the jury." Nevertheless, the district court stated that it would allow Fincher to present evidence outside the presence of the jury that under United States v. Miller, 307 U.S. 174 (1939), and United States v. Hale, 978 F.2d 1016 (8th Cir. 1992), his possession of the guns was reasonably related to a well regulated militia.

At the close of the government's case, Fincher moved for judgment of acquittal. The district court denied the motion, stating that it was based on an attack on the law and not the evidence, and that under Hale, 978 F.2d 1016, the fact that a particular weapon may be susceptible to military use does not by itself establish a Second Amendment right to possess the weapon.

During his case-in-chief, Fincher presented his own testimony, which the district court heard in camera. Fincher testified that he possessed the guns as part of his membership in the Washington County Militia ("WCM"), an organization he helped found in 1994. He testified that the purpose of the WCM is to ensure the

militia can operate as effectively militarily as possible in a time of state emergency and that the WCM has regular meetings and training sessions for its members. Fincher testified that between seven and nine individuals attend any given meeting of the WCM, though it is not always the same individuals in attendance. The WCM does not maintain a roster of its members or an inventory of weapons.

The WCM is not a secret organization. In fact, along with the other members of the WCM, Fincher wrote and sent letters to federal agencies via certified mail informing them of the WCM's existence and attempting to put them on notice that the WCM was lawful under state law. Fincher also sent at least one letter to the governor of Arkansas, informing him about the WCM, seeking approval, and stating that the governor's failure to object to the WCM's declaration would provide affirmation that the state of Arkansas did not object to the WCM. Fincher denied receiving a letter from the governor stating that the state records did not contain any reference to the WCM and that no such organization was registered with, or sanctioned by, the office of the governor or the state of Arkansas.

In addition to sending written notice of the WCM to various governmental offices, Fincher invited local sheriffs to view the WCM facilities and weapons. Fincher also told state officials that the WCM possessed machine guns, which the public could observe at any one of the three annual picnics sponsored by the WCM, and he showed the machine guns to at least one sheriff. Fincher also testified about how the weapons used by the WCM were chosen and stored, some at the WCM facility and others at the individual members' residences.

When asked about the procedures for activating the WCM in the case of an emergency, Fincher stated that if an emergency occurred while he was the commander of the WCM, he would contact "the sheriff if – if I was able, you know, depending on the emergency, or the governor, or probably any other – or maybe the mayor of a city or any – anyone or no one. If there was an emergency that had to be taken care of, we

have the right to preserve life, liberty, and pursuit of happiness. We have the duty to. You don't stand around and wait for someone to tell you you can protect your life or perform emergency medical assistance or put out a fire. These are natural offices of the people." He also testified that the state could call up the militia at any point, and that even though the written notices that WCM sent to various governmental offices did not contain any phone numbers or other direct contact information, the governor would know how to contact them.

The district court ruled that Fincher's proffered testimony would not be admitted because the WCM, despite its attempts to receive state recognition, was an unorganized and unregulated militia and therefore, as a matter of law, did not fall within the auspices of the Second Amendment. The district court also noted that even if the WCM was a state-sponsored or state-connected militia, there was no evidence that the person in charge of that militia would determine that possession of machine guns or sawed-off shotguns was necessary to the preservation of a well regulated militia.

**B. Discussion**

Fincher asserts that the district court erred by not allowing the jury to determine whether his possession of firearms was reasonably related to a well regulated militia and therefore protected by the Second Amendment. We review a district court's grant of a motion in limine for abuse of discretion, Robinson v. Potter, 453 F.3d 990, 995 (8th Cir. 2006), and we accord it great deference on evidentiary rulings such as the admissibility of proffered testimony, United States v. Wilson, 103 F.3d 1402, 1406 (8th Cir. 1997). We review *de novo* the district court's legal conclusions, such as whether possession of firearms in relation to membership in a non-state-sponsored militia is protected by the Second Amendment. United States v. Lippman, 369 F.3d 1039, 1043 (8th Cir. 2004).

The role of the jury is to decide facts, not legal issues. United States v. Peck, 161 F.3d 1171, 1174 (8th Cir. 1998). Accordingly, the district court did not err in prohibiting Fincher from arguing or presenting evidence regarding a question of law to the jury.

We turn to the question whether the district court erred by concluding that Fincher's possession of the guns did not fall within the protection of the Second Amendment. We conclude that the district court's determination that the WCM was not affiliated with the state militia and therefore not subject to the protections of the Second Amendment under Miller and Hale is well supported by the record.

Fincher contends that our decision in Hale, 978 F.2d 1016, established an affirmative defense to the charge of unlawful possession of firearms. In Hale, we stated that the possession of firearms is not protected unless the possession bears a reasonable relationship to a well regulated militia. 978 F.2d at 1020; see also United States v. Pfeifer, 371 F.3d 430, 438 (8th Cir. 2004) (citing Hale); United States v. Farrell, 69 F.3d 891, 894 (8th Cir. 1995) (same). Although the WCM is not a secretive organization and has held relatively regular training sessions and meetings over the years, we stated in Hale that "'[t]echnical' membership in a state militia (e.g., membership in an 'unorganized' state militia) or membership in a non-governmental military organization is not sufficient to satisfy the 'reasonable relationship' test." Hale, 978 F.2d at 1020 (citing United States v. Oakes, 564 F.2d 384, 387 (10th Cir. 1977)). In Arkansas, the state militia is defined as:

> (a) The militia shall be divided into two (2) parts: the organized, consisting of the active and inactive Army National Guard and Air National Guard; and the unorganized, consisting of all those persons of the militia not in the active or inactive Army National Guard or the Air National Guard.
> (b) The militia shall consist of all able-bodied male residents of the state between the ages of seventeen (17) and forty-five (45) years who are, or

intend to become, citizens of the United States, unless exempt by law, together with all other acceptable volunteers, waiving necessary requirements.

Ark. Code. Ann. § 12-61-101 (emphasis added). Thus, despite WCM's attempts to contact the governor's office and become an organized state militia, the district court correctly concluded that Fincher's testimony, even if believed by the jury, would not support his Second Amendment argument because Fincher is not a member of an organized state militia. Rather, Fincher's testimony established that the WCM was an "unorganized" militia because it is not the Army National Guard or the Air National Guard and is not formally connected with the state of Arkansas. Therefore, under Hale, Fincher's possession of firearms is, as a matter of law, not reasonably related to a well regulated militia and is thus not protected by the Second Amendment.

In reaching this conclusion, we have taken into account the Supreme Court's recent decision in District of Columbia v. Heller, 128 S. Ct. 2783 (2008),[1] in which the Court held that the District of Columbia's complete prohibition on the possession of usable handguns in one's home violated the Second Amendment. Id. at 2817-18. In holding that the Second Amendment guarantees "the individual right to possess and carry weapons in case of confrontation," Id. at 2797,[2] the Court also stated that the right to possess firearms is not beyond the reach of all government regulation. Id. at 2799, 2816 ("Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts

_____

[1] At trial, Fincher's Second Amendment argument focused on his claim of right to possess the guns because they are military weapons and he is a member of the militia and not a claim of an individual right to possess a machine gun or unregistered sawed-off shotgun. Nevertheless, we think it is clear that even if Fincher had made the latter argument at trial, his possession of the guns is not protected under Heller.

[2] We note that the Supreme Court did not address the question whether the Second Amendment is incorporated through the Fourteenth Amendment and thus applicable to the states.

routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.").

In discussing the limitations the government can place on an individual's right to possess firearms, the Court noted that Miller does not protect "weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." Heller, 128 S. Ct. at 2815-16. The Court also articulated a nonexclusive list of what it viewed to be acceptable government regulation of firearms:

> [T]he majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms. We also recognize another important limitation on the right to keep and carry arms. Miller said, as we have explained, that the sorts of weapons protected were those "in common use at the time." We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons."

Id. at 2816-17 (internal citations and footnote omitted).

Accordingly, under Heller, Fincher's possession of the guns is not protected by the Second Amendment. Machine guns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use. Furthermore, Fincher has not directly attacked the federal registration requirements on firearms, and we doubt that any such attack would succeed in light of Heller. Accordingly, because

Fincher's possession of guns is not protected by the Second Amendment, the district court did not abuse its discretion in preventing him from arguing otherwise to the jury.

## II. Court Appointed Counsel

### A. Background

The circumstances surrounding Fincher's court appointed counsel are fully recited in the district court's order, United States v. Fincher, No. 06-50064-001, 2007 WL 2177062 (W.D. Ark. July 27, 2007), and are largely undisputed by Fincher. For the purpose of our analysis, we will highlight the main facts.

Fincher was arrested on November 9, 2006, for violating 18 U.S.C. § 922(o). When he made his initial appearance later that day, he requested the appointment of an attorney because of his financial inability to retain counsel. He executed a "Financial Affidavit In Support of Request For Attorney or Other Court Services Without Payment Of Fee" ("the financial affidavit"), which indicated that he had no personal income, that his wife made $10.50 an hour, that he had $2,000 in savings, that he owned two vehicles of unknown value, one on which he was still making payments, and that he owned his home and 120 acres of real estate in Fayetteville, Arkansas, which had unknown value. Based upon that information, the district court appointed counsel to represent Fincher pursuant to the Criminal Justice Act.

On December 13, 2006, Fincher's appointed counsel withdrew because Fincher had retained other counsel. Thereafter, Fincher was convicted on both counts charged in the indictment. On March 8, 2007, Fincher informed the district court that he no longer had counsel and requested that counsel be appointed for him, which was done.

Before Fincher was sentenced, he executed a quitclaim deed conveying the 120 acres of real estate to his daughters in exchange for consideration of "One dollar

-8-

($1.00) and other good and valuable consideration," and reserving a life estate in the property for himself and his wife. Thereafter, the district court imposed concurrent sentences of 78 months' imprisonment on each count. Fincher was also subject to a fine of up to $250,000. Although the guidelines range called for a fine of between $12,500 and $125,000, the district court imposed a fine of only $1,000 under the belief that Fincher had no significant assets.

After sentencing, Fincher requested release on bond pending appeal. The district court conducted a hearing on the matter and agreed that Fincher could be released on $100,000 bond. Fincher indicated that he could not post bond in that amount. The district court noted that Fincher might be able to use his real estate to secure the bond, whereupon Fincher's daughters executed a mortgage for that purpose. As a result, the district court became aware that Fincher's property had significant value, and that Fincher had conveyed it to his daughters.

As a result of these circumstances, on July 3, 2007, the district court held an evidentiary hearing to determine Fincher's financial eligibility for court appointed counsel. The district court received testimony from Fincher, his wife, and his two daughters. The district court also requested that Fincher provide supporting documents, such as his contract with retained counsel and the deed transferring the real estate. In addition, the district court ordered an independent appraisal of the property, which estimated that it had a value of $455,000.

On July 27, 2007, the district court entered an order stating that Fincher "is not now, nor has he ever been at any time material to this proceeding, financially unable to obtain counsel to represent him in this proceeding and that appointments of counsel for him were improvidently made." Fincher, 2007 WL 2177062, at *10. Accordingly, the district court ordered Fincher to reimburse the United States Treasury $8,357.55 for the legal services provided to him by the attorneys appointed under the Criminal Justice Act. Id.

**B. Discussion**

Fincher asserts that the district court's July 27, 2007, order revoking his eligibility for court appointed counsel should be reversed because he did not misrepresent the value of his real estate when he stated that the value was unknown. He also challenges the appraised value of the property and the district court's conclusion that he owns the property free and clear. Fincher asserts that he was subjectively unaware of the value of the property when he filled out the affidavit, that the property is not worth nearly as much as the appraised value because it is landlocked, and that he owned it as a joint tenant with his wife. Fincher further contends that the transfer of the property to his daughters was legitimate because he informed the Assistant United States Attorney who was working on the case about the transfer.

The Criminal Justice Act provides a framework for ensuring that individuals who are financially unable to afford defense counsel are provided counsel as required by the Sixth Amendment. United States v. Brockman, 183 F.3d 891, 897 (8th Cir. 1999). The Act requires that each United States district court create "a plan for furnishing representation for any person financially unable to obtain adequate representation . . . ." 18 U.S.C. § 3006A(a). A person is eligible for court appointed counsel if, after the United States magistrate judge or court conducts an "appropriate inquiry," the court is satisfied that "the person is financially unable to obtain counsel." 18 U.S.C. § 3006A(b). Financial inability to obtain counsel is not the same as being indigent or destitute, but the defendant has the burden of establishing that he or she is financially unable to obtain counsel. Brockman, 183 F.3d at 897; Museitef v. United States, 131 F.3d 714, 716 (8th Cir. 1997). "If at any time after the appointment of counsel the United States magistrate judge or the court finds that the person is financially able to obtain counsel or to make partial payment for the representation, it may terminate the appointment of counsel or authorize payment as provided in subsection (f), as the interests of justice may dictate." 18 U.S.C. § 3006A(c)); see also

18 U.S.C. § 3006A(f) ("Whenever the United States magistrate judge or the court finds that funds are available for payment from or on behalf of a person furnished representation, it may authorize or direct that such funds be paid . . . ."); Museitef, 131 F.3d at 715.

Thus, our review of the district court's determination of financial eligibility for court appointed counsel is a three-step process. See United States v. Parker, 439 F.3d 81, 92 (2d Cir. 2006) (reviewing district court's mid-case appointment of counsel). We must ask, (1) whether the district court conducted an "appropriate inquiry" into the defendant's financial eligibility, (2) whether the district court correctly determined the defendant's financial eligibility, and (3) whether the district court erred when it weighed the "interests of justice." Id. at 92-93. Because we ultimately remand this issue to the district court for further review, we reach only the first of these three questions.

To determine a defendant's financial eligibility, the district court should make a "full inquiry" into the defendant's actual ability to retain counsel. Museitef, 131 F.3d at 716. A full-scale adversarial hearing is not required, however, before a district court may order repayment of attorney's fees under the Criminal Justice Act. United States v. Vale, 140 Fed. Appx. 302, 303 (2d Cir. 2005) (unpublished opinion) (citing United States v. Crosby, 602 F.2d 24, 28 (2d Cir. 1979)); see also Parker, 439 F.3d at 93 ("The task necessarily varies with the circumstances presented, and no one method or combination of methods is required." (internal quotation omitted)). We review *de novo* the adequacy of the district court's inquiry. Parker, 439 F.3d at 93 n.12.

In this case, the district court's initial inquiry was based upon the financial affidavit submitted by Fincher. See id. at 93 (noting that in some cases the court's inquiry may be limited to the defendant's statements on the financial affidavit). Based upon the limited information available at that time, the district court did not err in appointing counsel for Fincher. Brockman, 183 F.3d at 897 (any doubt about the

-11-

defendant's eligibility for court appointed counsel should be resolved in the defendant's favor); United States v. Cohen, 419 F.2d 1124, 1127 (8th Cir. 1969) (district court's determination that defendant was ineligible for court appointed counsel based upon the ownership of real estate with an unknown value and without a more searching inquiry was error).

Although a district court should investigate information contained in an affidavit when the information provided renders the defendant's eligibility questionable, the district court's initial determination of eligibility can be amended when new information comes to light. See In re Boston Herald, Inc., 321 F.3d 174, 179 (1st Cir. 2003) (erroneous eligibility determinations can be corrected at a later time). In this case, the district court became aware of the fact that Fincher's property had significant value when it was mortgaged to secure Fincher's $100,000 bond and Fincher testified that he knew that property in the same area had recently sold for between $2,000 and $4,000 an acre. This new information was sufficient to warrant a reexamination of Fincher's eligibility.[3]

Fincher argues that the district court erred in determining that he was not eligible for court appointed counsel because the district court did not take into consideration the fact that the property is landlocked and therefore is not as valuable as the appraisal indicates. Fincher testified at the hearing, however, that the property is located one mile off a public road and that there is an unpaved road that goes

---

[3]In its July 27, 2007, order, the district court noted that it should have conducted a investigation beyond Fincher's financial affidavit before it initially appointed him counsel. Fincher, 2007 WL 2177062, at *7. Nevertheless, the district court reasoned that the defendant has the burden of establishing financial eligibility for court appointed counsel and that Fincher did not meet this burden and in fact misrepresented his financial eligibility by listing the 120 acres as having an unknown value when, in fact, he knew that real estate in the same area had recently sold for between $2,000 and $4,000 an acre. See id. (citing United States v. Lefkowitz, 125 F.3d 608 (8th Cir. 1997)).

-12-

directly to the property. Fincher also informed the district court that the property has a right-of-way that, although not currently used, is attached to ownership of the property. Furthermore, it is undisputed that Fincher and his wife currently reside on the property, suggesting that the property is not in fact inaccessible. The appraisal acknowledges that any ingress and egress to the property would need to be improved, as the current road is not paved. Accordingly, we conclude that the district court did not err in accepting as accurate the appraiser's opinion that the property had a value of $455,000, which falls within Fincher's estimate that the property is worth between $2,000 and $4,000 an acre.

Fincher argues for the first time on appeal that because he owned the property as a joint tenant with his wife, he did not own it free and clear, and that the district court therefore erred by concluding otherwise. This late-raised assertion is directly contradicted, however, by the testimony of Fincher's daughter, who testified that Fincher's name is the sole one on the title. Furthermore, Fincher's wife testified that she did not know if she had ever been deeded any portion of the property. Although the quit claim deed that transferred the property to Fincher's daughters in early 2007 recites that Fincher and his wife each owned an undivided one-half interest in the property as tenants in common, there is no evidence in the record that Fincher and his wife owned the property as joint tenants. Accordingly, the district court did not err when it found that Fincher owned the property free and clear because Fincher has not established that there are any mortgages or liens on the property.

Regarding Fincher's transfer of the property to his daughters via quit claim deed, we conclude that Fincher's letter to the Assistant United States Attorney regarding the transfer of the property does not insulate the transfer from later question. Testimony at the evidentiary hearing from Fincher, his wife, and his two daughters, as well as the letter sent to the AUSA, all indicate that the property was transferred after Fincher's conviction to avoid the possibility of the property being sold to pay any fine imposed by the district court as part of Fincher's sentence. Accordingly, the

district court did not err in concluding that the attempted transfer of the property should be considered when determining Fincher's eligibility for court appointed counsel.

Despite these conclusions and the fact that the district court conducted a more thorough inquiry into Fincher's eligibility in July 2007 than it did initially, the district court's analysis leaves factual questions unanswered. Thus, we remand this issue to the district court for further consideration of whether Fincher's wife has any ownership in the property and, if so, whether that affects Fincher's ownership of the property or the application of the Arkansas Homestead Exemption. Specifically, the district court must consider whether the entire 120 acres of real estate is protected by the Homestead Exemption, making Fincher eligible for court appointed counsel despite his ownership of the property, or whether the exemption protects only a portion of the real estate. See Ark. Code Ann. § 16-66-210; see also United States v. Trevino, 679 F.Supp. 636, 636 (S.D. Tex. 1987) (doubting that defendants should have to sell their homestead to appeal criminal conviction); Perry v. Chief of Police of City of Marianna, Ark., 660 F.Supp. 1546, 1552 (E.D. Ark. 1987) (in determining indigency, defendant should not be required to sell his inexpensive car or his home).[4] Additionally, the district court should consider whether Fincher has the current ability

---

[4]Generally, cases in which a defendant's ineligibility for court appointed counsel has been affirmed are based upon the defendant's income and cash flow, not a requirement that the defendant sell his homestead to facilitate the payment of defense costs. See, e.g., Lefkowitz, 125 F.3d at 621 (defendant had recently spent several hundred thousand dollars on other attorney's fees and personal expenses and district court found defendant's own testimony of indigence to be lacking credibility); United States v. Harris, 707 F.2d 653, 661 (2d Cir. 1983) (district court found that defendant had "substantial income" in the past two years and might have had other undisclosed income); United States v. Wetzel, 488 F.2d 153, 157 (8th Cir. 1973) (affirming reimbursement order (for about $350) because defendant received $19,000 for the sale of cattle and owned real estate (the opinion provides no indication that the real estate was defendant's homestead)).

to reimburse the United States Treasury for the legal services he received in light of the transfer of the real estate to Fincher's daughters.

## III.  IFP Status on Appeal

We turn next to Fincher's request for *in forma pauperis* ("IFP") status on appeal.  Because we remand to the district court for further review the issue of Fincher's eligibility for court appointed counsel, we do not reach this issue.  Nevertheless, Fincher's IFP status on appeal is dependent upon his eligibility for court appointed counsel at the trial level.  If the district court concludes that Fincher is eligible for court appointed counsel and therefore should not be required to reimburse the cost of the legal services he received, and Fincher's financial circumstances do not change between the time of the district court and the appellate court proceedings, he should be granted IFP status on appeal.  See United States v. Danielson, 325 F.3d 1054, 1077 (9th Cir. 2003) (court appointed counsel continues on appeal unless defendant's financial situation changes and he or she is no longer financially eligible).

## IV.  Sentencing

On the basis of its conclusion that Fincher misrepresented his financial eligibility for court appointed counsel, the district court seeks a remand for resentencing.  In light of our conclusion that the district court must conduct a more searching inquiry into Fincher's eligibility for court appointed counsel, we decline the request for remand.   Moreover, it is questionable whether we have jurisdiction to remand in the absence of an appeal or cross-appeal from the government, or whether the district court has jurisdiction to resentence a defendant in the absence of statutory authority to do so.  See Greenlaw v. United States, No. 07-330, 2008 WL 2484861 (U.S. June 23, 2008) (holding that a circuit court cannot increase a defendant's sentence without a government appeal or cross-appeal); United States v. Ross, 245 F.3d 577, 585-86 (6th Cir. 2001) (district court may not resentence defendant without

statutory authority); <u>see also</u> <u>United States v. Sadler</u>, 234 F.3d 368, 373-74 (8th Cir. 2000) (a district court's "change of heart as to the appropriateness of the sentence, rather than a correction in the application of the guidelines," is not the type of "clear error" that can be corrected under Rule 35(c) (internal quotation and citation omitted)); <u>cf.</u> <u>United States v. Fortino</u>, No. 07-3476, 2008 WL 2388893 (8th Cir. June 13, 2008) (per curiam).

## V. Conclusion

The conviction is affirmed. The order directing Fincher to reimburse the United States Treasury $8,357.55 for the legal services he received pursuant to the Criminal Justice Act is vacated and the case is remanded the district court for further proceedings consistent with the views set forth in this opinion.

_____